## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MICHAEL TAYLOR,

     Plaintiff,

v.

SAFERENT SOLUTIONS, LLC
formerly CORELOGIC RENTAL
PROPERTY SOLUTIONS, LLC.,     Civil Action No. 3:22-cv-00342-DJN

and

CORELOGIC BACKGROUND DATA, LLC.,
formerly CORELOGIC NATIONAL
BACKGROUND DATA, LLC.

### AMENDED COMPLAINT

  COMES NOW the Plaintiff, MICHAEL TAYLOR, by counsel, and for his Amended Complaint against Defendants, SafeRent Solutions, LLC, formerly CoreLogic Rental Property Solutions, LLC ("SafeRent") and CoreLogic Background Data, LLC, formerly CoreLogic National Background Data, LLC ("NBD") (collectively, "Defendants") states as follows:

### OVERVIEW AND BACKGROUND

  1.  This is an action for (1) actual, statutory, and punitive damages, costs and attorneys' fees brought pursuant to 15 U.S.C. § 1681e(b) and 15 U.S.C. §1681k of the Fair Credit Reporting Act ("FCRA"); and (2) compensatory and punitive damages and costs and attorneys' fees for fraud; alternatively, for compensatory damages and costs for constructive fraud.

  2.  The FCRA requires that companies like the Defendants—which sold employment background check reports that have a serious and decisive impact on the ability of consumers to obtain and follow employment opportunities—employ reasonable procedures to assure the maximum possible accuracy of the information they report. Congress described these obligations

placed on consumer reporting agencies as "grave responsibilities." 15 U.S.C. § 1681.  Defendants failed to treat these obligations accordingly, and despite knowing that their underlying data and "matching" algorithms that selected records for inclusion into consumer reports had serious deficiencies, they continued to sell reports anyway to the detriment of consumers like Plaintiff.

3.      At all times relevant, Defendants were in the business of generating and selling consumer reports to be used for employment screening purposes. Defendants actively marketed their ability to produce these consumer reports to a nationwide network of hundreds of resellers.[1] Defendants actively solicited business from resellers[2] that they knew would provide consumer reports to their employer clients nationwide. Each time a reseller customer submitted a query to Defendant NBD, that customer provided the end user state and report user state for the consumer report to be generated by Defendant SafeRent from its database and then furnished to NBD for sale to its customer. The customer also identified that the report provided by Defendants would be used for employment purposes. In other words, Defendants knew (a) the state of the employer (end user) seeking the background check report from the reseller customer and (b) that the employer intended to use that report to make decisions regarding employment of the subject of the report. From March 14, 2007 through November 3, 2016, Defendants knowingly generated and furnished *over 1,136,000* consumer reports to employers in the Commonwealth of Virginia. Defendants knew that the consumer reports generated and furnished were to be used for an employment

---

[1] "Resellers act as information brokers, buying large volumes of consumer reports at discount rates from other CRAs and reselling the data to lower volume buyers." National Consumer Law Center, *Fair Credit Reporting*, Ch. 2.6.3.1 (9th ed. 2017), *updated at* www.nclc.org/library.

[2] Defendant NBD had over 470 "reseller" customers in 2016. (Oct. 25, 2015 L. Watts Dep. Tr. 44:23-46:21, Ex. 4 at 2 from *Witt v. CoreLogic National Background Data, LLC*, Civil Action No. 3:15-cv-386-REP). The clients of these customers "consist of employers in a wide variety of industries, from healthcare to bakeries, in a wide variety of jobs ranging from entry level manual labor positions to executives." (*Id.* Ex. 4 at 2).

purpose because each request for a report by Defendant NBD's customers required submission of a "permissible purpose code" to Defendants, and this code identified employment use as the permissible purpose.  Plaintiff knows these allegations to be factually accurate because his counsel have a complete copy of Defendant NBD's database of consumer reports generated and requested by its customers from March 14, 2007 through November 3, 2016. This database also includes the information the customers submitted to Defendant NBD when requesting reports.

4.      Defendant NBD previously faced two class actions which, as detailed below, relate to this case. In *Henderson v. CoreLogic National Background Data, LLC*, Civil Action No. 3:12-CV-97 (E.D. Va.), the Plaintiffs asserted class claims for Defendant NBD's uniform failure to comply with key provisions of the FCRA requiring it to provide notice to consumers notice "at the time" that it published consumer reports for employment purposes containing derogatory public record information (as required by 15 U.S.C. § 1681k(a)(1)), or in the alternative, to follow strict procedures designed to ensure that the information published was "complete and up to date" (as required by 15 U.S.C. §1681k(a)(2)). In *Henderson*, Defendant NBD unsuccessfully argued that "§ 1681k(a) does not apply to it because its wholesale results are not 'consumer reports' furnished for 'employment purposes' that are 'likely to have an adverse effect on a consumer's ability to obtain employment.'" *Henderson v. Corelogic Nat'l Background Data, LLC*, 178 F. Supp. 3d 320, 324–25, 2016 WL 1574048 (E.D. Va. 2016). *Henderson* recognized that NBD's "own documents…acknowledge[d] that it resells consumer reports" and "specif[ied] that the data NBD obtains from SafeRent and provides to its client shall be used for one of a limited number of 'permissible purposes' as defined by the FCRA, including 'employment purposes.'" *Id.* at 327-28. The Court also rejected NBD's argument that it in fact followed strict procedures to ensure that its consumer reports were complete and up to date. *Id.* at 335-38 ("[i]t is simply not complete under

the FCRA to say that 'someone named Bill Jones has a conviction record, but whether this is the Bill Jones you are inquiring about, I do not know.' Yet, that is precisely what NBD acknowledges to be the result that it provides.")

5.      Defendant NBD ultimately agreed to a class action settlement in *Henderson*, paying $7,540,000 into a settlement fund and acceding to injunctive relief mandating that it (a) employ more rigorous matching procedures for results it returned to its public records customers, (b) establish a website to allow settlement class members to access their criminal record data from Defendant SafeRent's database, and (c) create a dedicated process to receive and investigate disputes from settlement class members.

6.      Defendant agreed to the settlement in *Henderson* following extensive negotiations and discovery and multiple mediation and settlement conference sessions. *Henderson*, ECF No. 464-1 at 1.

7.      In *Witt v. CoreLogic National Background Data, LLC*, Civil Action No. 3:15-cv-386-REP, Defendants NBD and SafeRent defended class claims for violating 15 U.S.C. § 1681k(a) (both Defendants), furnishing consumer reports to NBD without an FCRA permissible purpose to do so (SafeRent), and use and resale of these consumer reports by NBD without an FCRA permissible purpose to do so (NBD). In *Witt*, Defendants unsuccessfully sought transfer to "the center of gravity for the conduct in question, the United States District Court for the District of Maryland." Defs'. Mem. Supp. Mot. Dismiss or Transfer Venue, ECF No. 52 at 2 (Feb. 16, 2016).[3] In seeking to transfer venue, Defendants acknowledged the nationwide (1) scope of their customer base and (2) dissemination of their consumer reports. Decl. of Suzette Lesane, ECF No. 52-4.

---

[3] Defendants further stated that *Witt* "could have been brought in the United States District Court for the District of Maryland…[b]ecause a substantial portion of the acts giving rise to this action occurred in [] Maryland." *Id.* at 18.

Defendant SafeRent's Vice President of Product Development executed a declaration under penalty of perjury stating, in part:

> 11. SafeRent's tenant screening reports are provided to clients in all fifty (50) states, and those clients are not concentrated in any particular state. Over the prior two year period, SafeRent has issued 4% of its total number of tenant screening reports to properties that are located within Virginia.

> 12. NBD's customers that have been granted access to SafeRent's Multistate Database are located across the country and are not concentrated in any particular state….

*Id.* at 2.

8.      Defendants agreed to class action settlements in *Witt*, one for a settlement class under Rule 23(b)(2) and another for a settlement class under Rule 23(b)(3). The Rule 23(b)(2) settlement provided for injunctive relief akin to that agreed to in the *Henderson* settlement and attorney's fees for class counsel. The Rule 23(b)(3) settlement obligated Defendants to pay $2,904,700 into a settlement fund. Plaintiff was a member of the Rule 23(b)(2) settlement class in *Witt*.

9.      None of the settlement class members in *Henderson* and *Witt* released individual claims for actual damages or attorney's fees and costs under the FCRA. The *Witt* Rule 23(b)(2) class members only released their right to file or participate in a putative class action based upon the allegations or claims asserted in *Witt*.

10.      In obtaining the benefits of the class settlements in *Henderson* and *Witt* and thereafter, Defendants engaged in one of two troubling courses of conduct: either Defendants affirmatively concealed from and misrepresented to the Court and counsel for the *Henderson* and

*Witt* settlement classes their position that the 15 U.S.C. § 1681p time periods[4] were not running while the class actions were pending, including while negotiating and finalizing the terms of the class settlement agreements and class notices and seeking Court approval of those class notices and the class settlements, or after actually having the position that the 15 U.S.C. § 1681p time periods were not running while the class actions were pending and after receiving a substantial benefit from articulating that position to the Court, Defendants now claim the contrary because it is expedient to do so.

11.     Absent Defendants' affirmative representations about the time periods in 15 U.S.C. § 1681p, neither preliminary nor final approval of the class settlements would have occurred.

12.     If Defendants succeed in securing dismissal of Plaintiff's FCRA claims in this action, Defendants' "success" will have arisen from misrepresenting its position regarding 15 U.S.C. § 1681p to (1) the Court, acting as a fiduciary for Plaintiff as an absent class member, and (2) settlement class counsel, acting as a fiduciary for Plaintiff as a settlement class member. *See In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) (stating that, "beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.")

13.     Following the conclusion of *Henderson* and *Witt*, by agreement of Plaintiff and Defendants, tolling of the FCRA's limitations time periods as to Plaintiff's claims has continued uninterrupted through the filing of his Complaint in this case.

---

[4] § 1681p provides, in pertinent part: "[a]n action to enforce any liability created under this subchapter may be brought in any appropriate United States district court, not later than the earlier of—(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs." *Id.*

**JURISDICTION**

14.     The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p, 28 U.S.C. § 1331, and 28 U.S.C. § 1332. Venue is proper in this Court as Defendants regularly conducted business in this District and Division. Plaintiff's common law causes of actions arose in this District and Division. Furthermore, significant third-party evidence and witnesses are in Virginia, including other individuals victimized by comparable FCRA violations by Defendants, the Executive Secretary of the Supreme Court of Virginia, and the Clerk(s) of Court maintaining the underlying public records Defendants falsely attributed to Plaintiff. Defendants sold one or more consumer reports about Plaintiff containing highly derogatory and false Virginia public records information knowing that the report(s) would be delivered to an employer to be used to evaluate Plaintiff's eligibility for employment. Some or all of the false public records attributed to Plaintiff by Defendants originated from the court system in Virginia. Defendants obtained, directly or indirectly, public records from Virginia's court system and governmental entities in Virginia.

15.     The Final Approval Orders in *Witt* and *Henderson* provide that this Court "retains continuing and exclusive jurisdiction over the Parties and all matters relating to the Lawsuit and/or [the Class Action Settlement Agreement and Release], including the administration, interpretation, construction, effectuation, enforcement, and consummation of the settlement and this Order." *Henderson*, ECF No. 501; *Witt*, ECF Nos. 374-75.

**PARTIES**

16.     Plaintiff is a natural person.  He is a "consumer" as defined by 15 U.S.C. § 1681a(c).

17.     Defendant SafeRent regularly conducts business in this state and directs business at this state. SafeRent is a limited liability company organized under the laws of Delaware. SafeRent maintained its company headquarters, i.e., "nerve center" in California through at least

October 17, 2019, well before the events giving rise to this Complaint. As of October 17, 2019, the "Exec-Controller" of SafeRent[5], declared in a "Texas Franchise Tax Public Information Report" that the "principal office" of SafeRent was located at 40 Pacifica Avenue, Suite 900, Irvine, CA 92618 ("40 Pacific Avenue"). The same report identified the Treasurer (David R. Hayes), Chief Financial Officer (Jim L. Balas), and President (Frank D. Martell) of SafeRent, listing their mailing addresses as 40 Pacifica Avenue. SafeRent is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. SafeRent currently sells and has sold consumer reports nationwide for many years. It maintains an extensive database of public records regarding consumers. With respect to Plaintiff, SafeRent sold one or more consumer reports generated from the database and furnished such report(s) to its sister company, Defendant NBD. NBD then sold the report(s) to one or more "reseller" consumer reporting agencies who, in turn, rebranded them and sold them to one or more employers located in this state for use in making employment decisions regarding Plaintiff. Before and after selling the report(s) at issue in this case, Defendant NBD directed business at this state by selling numerous reports to its customers that it knew would be forwarded to employers in this state.

18. Defendant NBD is a limited liability company organized under the laws of Delaware. NBD has no employees. At all times relevant, NBD has maintained its corporate headquarters, i.e., "nerve center" in California. No employee or officer of NBD lives or works in Texas. NBD maintains no operations in Texas currently, and maintained no operations in Texas when this action was initially filed. All officers of NBD live and work in California, as detailed below. In its most recent "Texas Franchise Tax Public Information Report," NBD identified its

---

[5] CoreLogic Rental Property Solutions, LLC changed its name to SafeRent Solutions on or about February 12, 2021.

Treasurer (David R. Hayes), Chief Financial Officer (Jim Balas), and President (Frank D. Martell),

listing their mailing addresses as 40 Pacifica, Suite 900, Irvine, CA 92618. The owner of NBD,

CoreLogic Information Resources, LLC, a limited liability organized under the laws of Delaware

with its company headquarters, i.e., nerve center, located at 40 Pacific Avenue. NBD lists its

current address and management and management location with the Texas Secretary of State as:

| | | | | |
|---|---|---|---|---|
| **BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY** | | | | |
| Filing Number: | 801287192 | Entity Type: | Foreign Limited Liability Company (LLC) | |
| Original Date of Filing: | June 25, 2010 | Entity Status: | In existence | |
| Formation Date: | N/A | | | |
| Tax ID: | 15624809842 | FEIN: | 562480984 | |
| | | | | |
| Name: | CoreLogic Background Data, LLC | | | |
| Address: | 12395 First American Way | | | |
| | Poway, CA 92064 USA | | | |
| | | | | |
| Fictitious Name: | N/A | | | |
| Jurisdiction: | DE, USA | | | |
| Foreign Formation Date: | September 22, 2004 | | | |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|
| Last Update | | Name | Title | | Address | |
| May 4, 2022 | | FRANK D MARTELL | PRESIDENT | | 40 PACIFICA SUITE 900 IRVINE, CA 92618 USA | |
| May 4, 2022 | | JIM BALAS | CFO | | 40 PACIFICA SUITE 900 IRVINE, CA 92618 USA | |
| May 4, 2022 | | DAVID R HAYES | TREASURER | | 40 PACIFICA SUITE 900 IRVINE, CA 92618 USA | |

Until January 12, 2022, Mr. Martell served as the President and Chief Executive Officer of

CoreLogic, Inc. He then assumed the position of non-executive Chairman of the Board of Directors

of CoreLogic, Inc. Mr. Balas is the Chief Financial Officer of CoreLogic, Inc. Mr. Hayes is

Executive, Finance (Division CFO) and Corporate Treasurer for CoreLogic, Inc. Mr. Martell, Mr.

Balas, and Mr. Hayes serve in their leadership roles at CoreLogic, Inc.'s corporate headquarters at

40 Pacifica Avenue. During a status conference before this Court in January of this year,

Defendant's counsel acknowledged that NBD "doesn't do business in the space anymore. And so

what exists as it relates to this case is pretty much there is nothing anywhere." *Wright v. SafeRent*

*Solutions, LLC, etc., et al.*, Civil Action No. 3:22-cv-198, ECF No. 11, Jan. 13, 2023 Status Conf.

Tr. at 5:14-17.

19.     At all times relevant to Plaintiff's claims, Defendant NBD operated as a consumer reporting agency that compiled and maintained files on consumers on a nationwide basis, and NBD sold and had sold consumer reports nationwide for many years.

**FACTS**

20.     Extensive discovery occurred in *Henderson* and *Witt*, including depositions of corporate designees and individual witnesses, interrogatories, and document production that included a complete copy of Defendant NBD's "Results Returned" database containing all of the information generated as a result of each NBD customer search from March 14, 2007 through November 3, 2016. The "Results Returned" database also includes the entirety of the information submitted by Defendant NBD's customers in the "Request" table. The "Request" table reflects end user state and employer user state submitted for each employment report request by Defendant NBD's customers. The full address for the consumer (at the time of the report request) provided by the requester also appears in the "Request" table. The discovery from *Henderson* and *Witt* already in the possession of Plaintiff's counsel establishes the inadequacy of the matching procedures employed by Defendants' when generating and furnishing one or more consumer reports that, as a practical matter, conclusively determined Plaintiff's eligibility for employment with the employer requesting the report(s).

21.     Between *Henderson* and *Witt*, the following employees of Defendants were deposed: Linda H. Watts (as corporate designee)—Operations Manager of Defendant NBD from 2010 (approximately) to August 1, 2016 (Oct. 25, 2015 L. Watts Dep. Tr. 7:20-8:1, 9:22-10:4); Matthew C. Knowles—Manager of Data Operations for Defendant SafeRent (Mar. 28, 2017 M. Knowles Dep. Tr. 7:3-5, 13:15-14:18); Sharron Goodman—Client Delivery Manager/Client Service Manager for Defendant NBD (Oct. 25, 2016 S. Goodman (Rough) Dep. Tr. 4-5). Class

counsel also deposed Michael J. Hall, then Senior Director of Data Operations for CoreLogic, Inc.[6] (Oct. 24, 2016 M. Hall Dep. Tr. 7:7-8:9).

22.   Defendant NBD sold criminal and employment-purposed background checks solely on a wholesale basis, i.e., directly to its reseller customers.[7] Consumers did not typically even know that an employment report originated from Defendant NBD, much less Defendant SafeRent. Defendant NBD touted its "work in the background to deliver the industry-leading background information search solutions [the employer clients of reseller background check companies] want [.]"[8]  As its marketing materials boast:

> National Background Data by CoreLogic® works behind the scenes to quickly deliver clear, consistent criminal background information. . . .  We sell exclusively through a network of carefully selected background screening providers. Which means all your customers see is YOU—and the concise, targeted, easy-to-read reports you deliver to them.

2012 NBD Marketing Materials, produced by Defendant NBD in *Henderson* at Bates number CL-H002764. Given the lack of any indicia of Defendant NBD's involvement in the preparation of background reports by its customers and the likelihood that the subject consumer might never even see the "reseller" report at all, Plaintiff lacked any awareness of Defendants' preparation of one or more highly damaging consumer reports about him for use in evaluating his eligibility for employment until he received notice of the proposed settlement in *Witt*.

23.   In March 2014, Plaintiff applied for employment with two or more prospective employers and submitted to background checks. These prospective employers requested background checks from third-party reseller consumer reporting agencies, OmniData and

---

[6] As the deposition date, CoreLogic, Inc. was the parent company of Defendants.
[7] http://www.corelogic.com/solutions/national-background-data.aspx (last visited Jan. 4, 2014).
[8] https://www.nationalbackgrounddata.net/marketing/about_us.html (last visited Jan. 4, 2014).

CastleBranch that in turn requested full background reports regarding the Plaintiff from the Defendant NBD, who in turn requested reports from its sister company, Saferent.

24.     In March 2014, Defendants published consumer reports to the resellers, Omni Data and Castle Branch, regarding Plaintiff for use in employment purpose consumer reports to be used by Teller Mortuary and Ops Research to evaluate Plaintiff's eligibility for employment.

25.     In March 2014, Defendants' produced consumer reports on at least two occasions regarding Plaintiff, indicating that he had been convicted of serious sexual crimes in various states, including but not limited to child molestation, rape, sexual battery, sodomy, forcible sodomy, aggravated sexual battery, sexual abuse, lewd lascivious acts with a child, indecent liberties with children and second degree sexual assault and published these consumer reports to third-party resellers, Omni Data and Castle Research, for use in employment purpose background reports to be published to Plaintiff's prospective employers.  In addition, Defendants reported that Plaintiff was a registered sex offender in Georgia, Indiana, Missouri, Utah, Virginia, Wisconsin, and North Carolina.

26.     Plaintiff has never been convicted of the crime(s) listed in the preceding paragraph.

27.     Defendants' publication(s) of false reports and public record information about Plaintiff would not have occurred but for the failure of Defendants NBD and SafeRent to follow reasonable procedures to assure the maximum possible accuracy of the information in their consumer reports. Further, Defendants failed to provide notice to Plaintiff "at the time" that each Defendant published the report(s) to a third party (as required by 15 U.S.C. § 1681k(a)(1)), or in the alternative, to follow strict procedures designed to ensure that the information published was "complete and up to date" (as required by 15 U.S.C. §1681k(a)(2)).

28.     The inaccurate report(s) caused Plaintiff substantial hardship, and Plaintiff suffered financial loss, humiliation, loss of sleep, anxiety, and embarrassment because of Defendants NBD and SafeRent's violations of the law.

29.     As a result of NBD and SafeRent's violations of 15 U.S.C. §§ 1681e(b), 1681k(a)(1), and 1681k(a)(2), Plaintiff suffered actual damages, including but not limited to: increased risk of denial or termination of employment, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

30.     After the Parties reached settlements in principle in *Henderson* and *Witt*, Hon. Robert E. Payne—Senior United States District Judge conducted a hearing regarding the proposed settlements. During this hearing, the following colloquy occurred:

> THE COURT: How are you going to explain that these people who don't get any money, that it's a reasonable settlement for them when, if there's a violation, they'd get a minimum of $100?
>
> MR. BENNETT: Sir, we have not—so we're not releasing their claims, not for punitive, not for anything. We are intending to have an injunctive relief notice only that  says, here are your rights, here is the information that you need to exercise those rights, and we're setting up—
>
> THE COURT: What's the statute of limitations? That's what the whole rub in that issue is.
>
> MR. BENNETT: I think for those individuals it would actually be five years from the point when—or two years from the point when they get their notice.
>
> THE COURT: Which is it—
>
> MR. BENNETT: Five years at the longest.
>
> THE COURT: All right, do you agree with that, Mr. Anthony?
>
> MR. ANTHONY: I agree with that as a matter of principle, but I think there's some added layer on it to the extent you have the interplay of *American Pipe* tolling and the definition varied over time, but as a general proposition, I agree with that.
>
> THE COURT: I see.

MR. ANTHONY: Secondly, both of the cases, the class definitions changed, so, you know, I would probably tend to agree with Len in terms of those are the two parameters, but how they would exactly come to play on these three subclasses, to me, has a little bit more subtlety to it….

*Henderson*, ECF No. 455, Aug. 15, 2017 Hr'g Tr. 14:3-15:7.

31.     After the filing of the motions for preliminary approval of the class action settlements in *Henderson* and *Hines*, the Court conducted a hearing on those motions on August 28, 2017. Judge Payne repeatedly inquired about the tolling of individual claims that would not be released by those settlements:

THE COURT: Because the notices—and that has to do with another matter that I'm going to bring up, because you have obligations to these people that transcend the settlement of this case, and I want that made so clear and what their rights are and when their rights attach, et cetera. One way of reading this settlement agreement is that if they don't join the class, their claims for actual damages are barred by the statute of limitations because there's no tolling provision in here, and if that's the case, you have to say something like that.

THE COURT: One thing on the [preliminary approval] order here, don't we have—don't you need to do a different class definition or something? And what about the—my understanding of the law is for people who opt out, the statute of limitations is tolled while this case has been pending. Is that provided for in here, or what's the effect of some of these time limits on that? And we're back on Henderson.

MR. BENNETT: Yes, sir. With respect to the tolling issue, the defendant should state its belief on the record for equitable tolling purposes, but the Supreme Court decision in *American Pipe* held that all class member claims, putative class member claims were tolled during the pendency of the class action until and unless class certification was denied, or, in this instance, the Court were to issue an order certifying class than if they were in the larger class, a larger class, their claims would cease to be tolled.

With respect to actual damage claims or other claims, Rule 15 and the relation-back doctrine has been applied to allow the tolling of those as well, but the defendant could clarify that by stating on the record its agreement in advocating for the settlement that the individual class member actual damage and other non[-]statutory nonpunitive damages claims were tolled through the final approval date.

What that means, though—

THE COURT: Not through the final approval date.

MR. BENNETT: The effective date.

THE COURT: There has to be an order entered, doesn't there? Maybe I'm wrong in reading *American Pipe*, but don't I actually have—maybe it's the class approval order that does it. The notice in here has to say, in words of one syllable, those of you who choose to opt out have retained, of course—you are not releasing your claims for actual damages. You may have claims for actual damages, and you have to file those claims within X date after the order that the Court approves or you lose them, and class counsel will be glad to help you, refer you to another lawyer or whatever.

They have—you see, this isn't a simple class action settlement….I think opt-out objections ought to be the simplest, easiest way to go. But in any event, they need to be told what the situation is in these cases, because these are such complex matters, and it has to be simple….

THE COURT: So anyway, you're going to take care of the tolling, and you're in agreement that all the damage claims are tolled for people who opt out, and—I mean the damage claims are tolled—actual damage claims are tolled for everybody. For people who opt out, all of their—statute is tolled as to them.

MR. BENNETT: Yes, sir, although—

THE COURT: When does it kick back in?

MR. BENNETT: We didn't negotiate the substance of this.

THE COURT: Under the law, when does it kick back in?

MR. BENNETT: When the Court enters an order that resolves the class.

THE COURT: How much more time would they have?

MR. BENNETT: They would have however much time that they had while the lawsuit was pending. So if the claim was to have expired the day before the competitive class was alleged, they'd have a day.

MR. ANTHONY: That's my understanding, Your Honor. It's not like the Virginia state nonsuit statute where you have a built-in tolling period. Automatically you don't have that. I would agree that—

THE COURT: I take your claim as you find it. It's tolled with the filing, whether you have a year left or a day left, and then once that's done, once the class issue is decided, then it starts to run.

MR. ANTHONY: Here is my understanding: I would agree with the statements that have been made about *American Pipe* tolling with two caveats or qualifications. *American Pipe* tolling, as I understand it, is not a toll to any possible claim under the sun. For instance, if there were—I'm going to make it up—a personal injury claim arising out of a defective product, *American Pipe* does not toll any possible claims.

It's my understanding that it's the claims that are at issue that are tolled, and—

THE COURT: Claims at issue in the class action.

MR. ANTHONY: Correct.

THE COURT: I think that's right.

MR. ANTHONY: There can be nuances even to that. For instance, in this case where the claims varied, there were amendments to the claim, and you overlap that with—

THE COURT: What does all that mean? That, to me, means confusion.

MR. ANTHONY: Let's assume that the original complaint had five claims in it, and by the time it got to the last iteration, there were two claims. There's case law out there saying, what do you do? Is the statute tolled for all five, or is it just all two? So when you take that nuance that I think, if my memory is right, we had a fourth amended complaint in the Hines/Henderson case with—unique to the Fair Credit Reporting Act, you have a discovery rule for the statute of limitations, it's been my experience that figuring out what is the actual statute of limitations, you have to look to the claim that's been asserted—

THE COURT: Slow down.

MR. ANTHONY: Look to the claim that's been asserted, look to how that plays into the history of the claims that were asserted in the case as well as the discovery components to figure out what the statute of limitations is.

I've done that before in the Fair Debt Collection Practices Act case that we had, and, you know, it was a mess. It was not easy to do with a uniform answer because it varied in that situation. So as to the application of *American Pipe* to the claims at issue, we agree subject to the two points I made.

16

THE COURT: Well, claims of all opt-outs are tolled to the extent that those claims were raised in the original complaint; is that right?

MR. ANTHONY: Unless they were varied by amendment.

MR. BENNETT: Judge, the claim has not changed.

THE COURT: I don't think the claims ever really changed. I think the class changed.

MR. BENNETT: Yes, sir.

THE COURT: That's all I remember changing in this case. And then they would be tolled—all claims for actual damages for even those who remain in the case and don't opt out are tolled until X, and we need to figure out what X is.

MR. ANTHONY: Let me be clear on one point. We're happy to state our position, you know—I've briefly given you an overview of my understanding as a defendant of *American Pipe*, but one question I want to be clear about, as I would—my fallback would be, as you mentioned, Your Honor, the claim is as the plaintiff finds it. So is it your thought that we are going to build in a specific tolling period that we would agree to as the defendant and say, you know, if your claim is let's pick a random date. Let's say—

THE COURT: I don't think that's the way to do it. I think the way to do it is to say that the statute of limitations—your claim may or may not be barred by the statute of limitations, but you—no matter whether it is or is not, you have X days from the date of this order to file your claim, and during that period of time, the tolling will remain in effect.

And then you're left with whatever rights you've got to assert the statute of limitations, and they are left with whatever right they have. In other words, the class action—because we're changing things, the notice ought to tell them that they've got to get up and get on the horse and ride or they're going to lose their claim.

MR. ANTHONY: Let me try to state that a different way to make sure I'm on the same page. For instance, this notice is going to go out after the Court preliminary approves the settlements.

THE COURT: And the notices.

MR. ANTHONY: And afterwards and before the final approval hearing. So until the Court enters the final approval, the statute of limitations would not begin to run again. So between that date, the date of the preliminary approval hearing and the notice and the final approval hearing, there's nothing to toll.

THE COURT: No, it's tolled.

MR. ANTHONY: It is tolled.

THE COURT: I just think that notice needs to say, your claim could expire within a short period of time after the final approval if there is a final approval, so get on your horse and get a lawyer now and look at it.

*Henderson*, ECF No. 455, Aug. 28, 2017 Hr'g Tr. 35:14-23, 53:19-55:6, 55:15-18, 56:13-57:13, 58:18-60:19, 61:13-63:2.

     32.     The Class Notice in *Henderson*, as approved by the Court, contained the following language:

- You also may have a claim for the payment of actual damages – for example, if an employer acted based on an incorrect sex offender record – but you must act and do so quickly before the statute of limitations expires.

You and other members of this class action applied for a job sometime between February 2007 and January 2012. The employer obtained a criminal background check from another company, which obtained some of its records from Defendant. However, the information that Defendant sold to the background check company included sex offender records that did not belong to you or other Class members. Plaintiff contends that the sex offender records did not belong to you because the records contain a different age or date of birth than your information. You may not have known about the report because it is possible that the record was not ultimately provided to the employer or because the employer may not have acted on that record.

The Court ordered this notice because Class members have a right to know about the settlement and their options to remain in the Class or opt-out.

**The Right to Sue for Actual Damages.** This settlement does not compensate you for any actual damages you may have incurred, such as loss of employment, embarrassment or distress. Nothing in this settlement requires Defendant to honor the claim and it may assert any available defenses. You do not need to exclude yourself from the settlement to pursue this option. You may contact Class Counsel for advice or assistance at (757) 930-3660, or by emailing hines@clalegal.com.

If you intend to pursue a claim for actual damages, the time for you to pursue such a claim may run out soon because of the statute of limitations. This lawsuit may have tolled the statute of limitations for your individual claim but, if applicable, this time period will restart after the Effective Date, which in most cases will be fourteen (14) days after final approval of the settlement. If you intend to file your own claim, you should act immediately.

**5.   WHAT IF I LOST EMPLOYMENT OR SUFFERED OTHER ACTUAL DAMAGES?**

This settlement does not compensate you for any actual damages you may have incurred such as loss of employment, embarrassment or distress. You would have to bring your own claim or new lawsuit to recover such damages and this settlement does not limit your right to do so. Nothing in this settlement requires Defendant to honor the claim and Defendant may assert any available defenses.

You may contact the attorneys representing the Class for advice by emailing hines@clalegal.com, or by calling Class Counsel at (757) 930-3660.

If you intend to pursue a claim for actual damages, the time for you to pursue such a claim may run out soon because of the statute of limitations. This lawsuit may have tolled the statute of limitations for your individual claim but, if applicable, this time period will restart after the Effective Date, which in most cases will be fourteen (14) days after final approval of the settlement. If you intend to file your own claim, you should act immediately to secure legal representation.

**6.   WHAT DO I GIVE UP BY STAYING IN THE SETTLEMENT?**

Unless you exclude yourself from this Class, you will be considered a Class Member, which means you give up your right to sue or continue a lawsuit against Defendant under the FCRA or any state law equivalents where you would be seeking punitive or statutory damages.  The full release and list of released parties may be found at www.hinessettlement.com, or by calling (866) 680-8427 for assistance.  Class Members are also barred from filing or participating in a putative class action lawsuit based upon the allegations and claims asserted in the lawsuit.

However, even as a Class Member, you can still pursue any individual claim you have for **actual** damages against Defendant that are recoverable under the FCRA and FCRA state equivalents, other than statutory and punitive damages.  Nothing in this settlement requires Defendant to honor the claim and Defendant may assert any available defenses.

**7.   HOW DO I EXCLUDE MYSELF FROM THE SETTLEMENT?**

To completely exclude yourself from the settlement, please sign the enclosed "Opt-Out Form," check the "opt-out" box, and postmark it before the deadline of **December 23, 2017**.  To be valid, the form must be personally signed by you.  If you opt-out of the settlement, you may be able to bring your own individual claim for any damages.  Nothing in this settlement requires the Defendant to honor the claim and it may assert any available defenses.  However, you may still be precluded from participating in any later class action against Defendant for the same violations alleged here.

*Henderson*, ECF No. 479-1.

33.     The Court-approved Class Notices in *Witt* contained substantially similar language to the language from the *Henderson* Class Notice excerpted above. *Witt*, ECF Nos. 338-1, 339-1.

34.     None of the settlement class members in *Henderson* and *Witt* released individual claims for actual damages or attorney's fees and costs under the FCRA. The *Witt* Rule 23(b)(2) class members only released their right to file or participate in a putative class action based upon the allegations or claims asserted in *Witt*.

35.     During the Final Approval Hearing in *Henderson* and *Witt*, the Court repeatedly addressed the preservation of class members' actual damages claims in overruling objections and approving the class settlements. Mar. 20, 2018 Hr'g Tr. *passim*.

36.     The Court denied as moot an objection from Samuel Smith, concluding that his objection resulted from his misunderstanding that the settlement in *Henderson* precluded him from seeking actual damages against Defendant. *Id.* 8:18-9:14. Mr. Smith signed a Declaration stating:

## DECLARATION OF SAMUEL SMITH

1.  I received a class notice in the above referenced matter and responded with my own letter dated January 16, 2018 informing the Court that I did not like the settlement.

2.  I have never been charged with a sex offense and believed that the settlement would not allow me to pursue my own claim against CoreLogic for any damages that I suffered, and therefore I indicated that I did not believe that the settlement provided adequate compensation.

3.  As I am now aware that I have the right to pursue my own claim, I wish to withdraw my objection and intend to pursue any claims for damages that are otherwise available to me against Corelogic.

I declare that the foregoing is true and correct.

Executed on March _9_, 2018.

Samuel Smith

*Henderson*, ECF No. 495-1. Based on this Declaration and representations made at the Final Approval Hearing, the Court overruled Mr. Smith's objection. Mar. 20, 2018 Hr'g Tr. 8:18-9:14.

37.     In addressing communication from David Pierce, another *Henderson* settlement class member, the following colloquy occurred:

THE COURT: So do you want to tell me about Mr. Pierce?

MR. BENNETT: Yes, sir. So Mr. Pierce, I believe comparable to Mr. Evans—and I appreciate his involvement. But Mr. Pierce just filed a letter with the Court stating that he thanks us and the Court for the settlement. He appreciated the notice. In fact, at the very last sentence, as I recall, is a big thank you. He says that he hopes and wants that there be court ordered restitution for his actual damages.

We have reached out to Mr. Pierce and would represent him, as we do in a—now I think hundreds of individual class members. We will make individual demands to the defendant.

That is a process, just as an aside, that was negotiated with the defendant. It's aware that it's coming, and it was—in the preliminary approval hearing, the Court, Judge Payne—it was a very important part of the Court's consideration to settlement. As he said on the record, "And, Mr. Bennett, you're going to represent these people." And I said, "Yes, Your Honor."

So Mr. Pierce is one of those individuals. But he doesn't complaint as to any—or otherwise object, and I think that both the defendant and the plaintiff independently determined that his letter, like some that are in some of the other settlements, states a position but does not state an objection critical.

THE COURT: All right. For that reason, I'll overrule his objection. Just so the record is clear, that's ECF No. 489.

MR. BENNETT: Your Honor, we would ask the Court to find that it is not an objection. That is a distinction. Because when the Court—the objections matter because the settlement administrator can begin processing and mailing of checks from an effective date.

THE COURT: All right. So—well, to be clear, then, is he articulating the fact that he has concern about the settlement or that he is asking questions as it relates to his actual damages?

MR. BENNETT: He is asking questions as it relates to his actual damages, Your Honor. He does not state that—

THE COURT: All right. Then I'm going to deem it as withdrawn, then.

MR. BENNETT: Yes, sir.

THE COURT: So it will be denied as moot since it's been withdrawn.

*Id.* 9:16-11:15. Defendant voiced no disagreement with the representations made to the Court or the Court's findings in denying as moot the objections of Mr. Smith and Mr. Pierce.

38. During the Court's evaluation of the fairness, reasonableness, and adequacy of the *Henderson* class settlement, the following exchange occurred:

MR. BENNETT: I would say the injunctive relief is important and critical. I'll talk about that. But even before that, the notice that was sent out was designed to tell people, in big, bold letters, you have been accused of being a sex offender or you've been accused of being a criminal, and you're not.

THE COURT: Right.

MR. BENNETT: And those individuals—that notice was as effective as we've ever sent out because people called us. We had people crying. We had people excited and happy at the opportunity. And—

THE COURT: Essentially what was going on here is that folks were potentially losing jobs without knowing why they were losing jobs because their criminal—it was being reported to potential employers that they may have had a criminal record of such, and there was not—the information that was reporting that was not reliable, right?

MR. BENNETT: It was not reliable, and the source of it was not known. It was not known to us when we started the litigation as consumer advocates. It's not known to consumers.

I would bet that under examination, 91.46 percent of the class, all of the class that could be reached, would have said they had never heard of this company.

THE COURT: Right. So there's nothing worse to an applicant for a job when they're denied a job not knowing, first of all, why they're denied, and secondly, if it was improperly—an improper basis to do so.

THE COURT: So in my mind, taking it in two steps now I think we're both saying the same thing. The notice that you're sending out to these folks is the first time that they are learning that this could be the reason why they were denied a job. And that while there's a class resolution, they'd also have the ability now if they wanted to seek actual damages down the road, right?

MR. BENNETT: Correct.

*Id.* 23:20-25:10.

39.     After approving the *Henderson* class settlement and request for attorney's fees and

expenses, the Court turned to the language of the Final Approval Order:

THE COURT: Now, as I understand it, you all have tendered a revised joint approval order; is that right?

MR. BENNETT: We have, Your Honor.

THE COURT: So let me ask you this. At the bottom of the order, I believe you indicated this order is appealable; is that right?

MR. BENNETT: That's what defendant added.

THE COURT: Can you tell me why? Maybe I should speak to Mr. Anthony.

MR. BENNETT: If I—from the plaintiffs' perspective, what I understood it to mean is that—because what the defendant is addressing is the fact that Mr. Hines and Mr. Henderson continue to have their individual claims as part of this

procedure. The Court may be familiar with our position is we don't negotiate individual settlements during—

THE COURT: Right.

MR. BENNETT: And so we have an agreement by the defendant that the statute of limitations as to our clients or as to class members kicks in after final approval. And so there will be—with those, Mr. Hines and Mr. Henderson, and with the other class members, Mr. Anthony is expecting us to give him a demand of these individuals. Part of our job is to continue to try to get those resolved.

With Mr. Henderson and Hines, the Court, at the end of this case, at the end of today, if the Court approves the settlement as the Court indicated and enters the order, you wouldn't end the docket. There would still be a live case at least until we can try to negotiate the individual claims—damage claims of Henderson and Hines.

And so the defendant's point is that it's final the way that a denial of a 12(b)(6) motion is not final. I don't believe that anyone is suggesting that it is appealable, there'' a basis to appeal. And so a proper language—Mr. Erausquin had pushed this with me last night and I pushed back at him, but the proper language would be that this is a final order. But I don't think anyone is suggesting that it is appealable because there's any—there's no party to appeal.

THE COURT: Well, that's what our question is. Mr. Anthony, do you want to speak for yourself on that?

MR. ANTHONY: That's what we were trying to accomplish, Judge.

*Id.* 35:23-37:22.

40.     While evaluating the *Witt* 23(b)(2) class settlement, the Court noted that "the release is very narrowly tailored," to which Mr. Bennett responded by noting "Yes. And no release at all for individual claims. Only the right to duplicate the exact same case for injunctive relief— and this class remedy is barred." *Id.* 43:7-12. The Court also overruled an objection from Marie Stine a/k/a Marie White:

THE COURT:  Because as I understand what her objection is, it's essentially that she's not getting enough personal relief because she believed that she endured some significant harm here; is that right?

MR. BENNETT: That's correct.

> THE COURT: All right. And so you can continue to—you can represent her on an individual basis if she pursues that relief, just like you could represent anybody else. I just don't think that what her complaint is truly addressed here by the class settlement. In other words, I don't think the class settlement is [er]adicating her right to seek the relief that she really truly seeks. She just doesn't understand the difference between the two.
>
> You're helping her find her way, though, right?
>
> MR. BENNETT: That's correct. We are.
>
> THE COURT: So I'm going to overrule the objection believing that it's not well placed because her real relief that she's seeking is on an individual basis, and you're taking care of that. And I'm going to find there's no conflict that you have. Does that resolve that one?
>
> MR. BENNETT: That does, Judge.

*Id.* 48:22-49:20. In overruling another objection, the Court stated: "[s]o for the same reason as to Mr. St[ine], I'm going to overrule this objection believing that the remedy to her actual complaint lies and any individual actions that she brings for actual damages have been preserved with this settlement." *Id.* 51:21-52:1. The Court returned to the preservation of individual claims in overruling an objection from Darryl Mitchell:

> THE COURT: But also let's talk about him indicating that the class members are not being adequately compensated. And I think that kind of goes to the issue raised in the other complaints, which is that it's really addressed to any individual harm that they may have, and they preserve the right to seek any actual damages if he wants to do so; is that right?
>
> MR. BENNETT: Yes, sir. But they can seek punitive damages. He's completely unfettered. The only thing he can't do is seek the exact same injunctive class relief that we're seeking.
>
> THE COURT: Right.
>
> MR. BENNETT: Individually he is—and the 23(b)(2) folks, every one of these objections, including Mr. Mitchell, every class member could walk outside—we could take this young lady who's a Rule 23(b)(2) class member and walk to the third floor and filed a new lawsuit from scratch seeking every remedy available for her individual claim.

THE COURT: All right. So like Ms. Jackson's, I'm going to deny—or I'm going to overrule Mr. Mitchell's objections.

*Id.* 55:12-56:8. Vincent Wilson objected, stating:

> I Vincent Wilson OBJECT TO The Settlement reason being, I was denied a Job opportunity because of my backround CHeck which was Totally inaccurate, I've Enclosed a letter from The Company which I was denied Employment, I Vincent Wilson feel That a monetary settlement would be Justice Concerning This matter

*Witt*, ECF No. 357. The Court denied Vincent Wilson's objection as moot after it was verbally withdrawn following assurances to him that he retained the right to pursue an individual action. As detailed below, Defendants currently assert that the 15 U.S.C. § 1681p time periods extinguished Vincent Wilson's individual claim as of March 31, 2017, prior to preliminary approval of the *Witt* 23b2 settlement by Judge Payne.

41.     The Court thereafter asked Defendant's counsel whether Defendant had anything to say before the Court made its findings regarding final approval of the *Witt* 23b2 class settlement. Defendant's counsel responded, "I don't have anything else to add, Judge, other than you know, we do believe that the settlement is fair, reasonable and adequate and should be approved by the Court." *Id.* 59:17-22.

42.     In approving the fee requested in the *Witt* 23b2 class settlement, the Court found that:

> [T]he release agreed to in the settlement has been narrowly tailored to release only the class claims identical to those pled in the case. And no other class claims are released, and importantly, class members retain their ability to pursue any actual damage claims that they

may have. Class members have class counsel's direct contact information to assist them, and that's already going on, as indicated by class counsel here today.

*Id.* 63:14-22.

43.     Following final approval of the *Witt* class settlements, the Court, in addressing a filing by Vivian Buckles, issued an Order, stating, in part: "Ms. Buckles does not, however, object to either the Witt Rule 23(b)(2) nor the Witt Rule 23(b)(3) Class Settlement, and those class settlements did not release any individual claims. Thus, Ms. Buckles preserves her right to seek individual relief." *Witt*, ECF No. 377.

44.     Unbeknownst to the Court and counsel for the *Henderson* and *Witt* settlement classes prior to the initiation of this action, Defendant actually takes the following positions on the availability of individual relief to settlement class members:

    A.      As of the Final Approval Hearing, 15 U.S.C. § 1681p barred every single individual claim based on "search results provided by [Defendant] between February 9, 2007 and January 12, 2012." *Henderson* Final Approval Order, ECF No. 501 (Mar. 22, 2018). In other words, Defendant's position is that § 1681p permanently barred the individual claims of the 75,400 class members in the *Henderson* settlement class based on any reports it furnished during the settlement class period.

    B.      As of the Final Approval Hearing, 15 U.S.C. § 1681p(2) barred any individual claim for *Witt* 23b2 and 23b3 settlement class members based on "search results provided by Defendant between June 26, 2010" and March 21, 2013. *Witt* Final Approval Orders, ECF Nos. 374-75.

45.     Defendants affirmative representations about their position on what they would and would not do regarding 15 U.S.C. § 1681p time periods occurred in the context of securing approval of class action settlements, in which Defendants knew that the Court was acting "as a

fiduciary of the class." *Sharp Farms v. Speaks*, 917 F.3d 276, 293-94 (4th Cir. 2019) (citing *Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 283 (7th Cir. 2017) ("[W]e have repeatedly stated that district courts should act as the fiduciary of the class, subject to the high duty of care that the law requires of fiduciaries.") and *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1996) (stating that "the district court has a fiduciary responsibility to ensure that the settlement is fair and not a product of collusion and that the class members' interests were represented adequately.")).

46. The Court's fiduciary duty in evaluating class action settlements arises, in large part, to protect absent class members' rights. § 13:40. Fiduciary role of court, 4 Newberg and Rubenstein on Class Actions § 13:40 (6th ed.). As noted in the *Manual for Complex Litigation*, "[b]ecause there is typically no client with the motivation, knowledge, and resources to protect its own interests, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Manual for Complex Litigation, Fourth*, § 21.61; s*ee also* Barbara J. Rothstein and Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, 12 (3d ed. 2010) ("Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, and because settling counsel for both plaintiff and defendant have little or no incentive to offer information adverse to the settlement, you need to examine critically the class certification elements, the proposed settlement terms, the proposed notice plan, and the procedures set out for implementing the proposed settlement.").

47. Defendants, through their affirmative representations regarding their position that they did not claim that 15 U.S.C. § 1681p time periods continued to run on the claims at issue during the class actions, and their repeated statements about the availability of individual relief to

absent class members as it existed at the time the class claims were filed, induced (1) the Court to preliminarily and finally approve the class settlements in *Henderson* and *Witt*, (2) counsel for the settlement classes in *Henderson* and *Witt* to seek preliminary and final approval of the class settlements, and (3) objectors and absent class members to acquiesce to final approval of the class settlements.

48.    Absent Defendants' affirmative representations about the time periods in 15 U.S.C. § 1681p, neither preliminary nor final approval of the class settlements would have occurred.

49.    The FCRA includes both a two-year time period (based on discovery) and a separate five-year time period from the date of the violation. 15 U.S.C. § 1681p; *see also Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We consequently hold that 'discovery' as used in [the Securities Exchange Act of 1934] encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known.")[9]; *Feraro v. Impac Funding Corp.*, No. 5:12-CV-00322-EJD, 2012 U.S. Dist. LEXIS 76466, at *6 (N.D. Cal. June 1, 2012) ("The structure of the statute of limitations—in particular, the existence of that grace period—demonstrates that the five-year limit is intended to be absolute.").

50.    The Fair and Accurate Credit Transactions Act of 2003, PL 108–159, December 4, 2003, 117 Stat 1952 enacted the current version of 15 U.S.C. § 1681p:

SEC. 156. STATUTE OF LIMITATIONS.

Section 618 of the Fair Credit Reporting Act (15 U.S.C. 1681p) is amended to read as follows:

---

[9] "[T]he ultimate burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have *discovered* the facts constituting the violation." *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir. 2012) (citing *Merck & Co., Inc. v. Reynolds*). The statutory language regarding "discovery" addressed by *Merck* is very similar to the "discovery" language in 15 U.S.C. § 1681p.

"§ 618. Jurisdiction of courts; limitation of actions

"An action to enforce any liability created under this title may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of—

"(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or

"(2) 5 years after the date on which the violation that is the basis for such liability occurs.".

PL 108–159, December 4, 2003, 117 Stat 1952.

51.     Because Plaintiff lacked any awareness (or reason to be aware) of Defendants' violations of the FCRA before receiving notice of the proposed class action settlement, he was subject to the five-year time period in § 1681p until receiving such notice. The earliest possible date of Plaintiff's "discovery" of Defendant's FCRA violations coincides with his receipt of notice of the class action settlement.

52.     Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, the FCRA statute of limitations applicable to Plaintiff's claims against Defendants was tolled by the filing of the complaints in *Henderson* and/or *Witt*. Following the conclusion of that proceeding, by agreement of Plaintiff and Defendants, tolling of the FCRA's statute of limitations as to Plaintiff's claims has continued uninterrupted through the filing of this Complaint.

53.     Defendant contends that *Cal. Pub. Emps.' Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042 (2017) prohibited tolling of the FCRA's five-year time period as to any of the class members in *Witt* and *Henderson*. Therefore, Defendant claims that Plaintiff permanently lost the right to pursue any individual claim against Defendant before final approval of the *Henderson* and *Witt* class settlements.

54.     To "protect the essential integrity of the judicial process," the Court should prohibit, by applying judicial estoppel or otherwise, Defendant from "playing fast and loose with the

Courts" by assuming a completely contradictory position in this action simply because its "interests have changed." *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L.Ed.2d 968 (2001).

### COUNT ONE—VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)

55. Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

56. Defendants NBD and SafeRent failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained in the consumer report(s) that each sold regarding the Plaintiff.

57. The conduct, action and inaction of Defendants was willful, rendering Defendants liable for actual, statutory, and punitive damages, attorneys' fees and costs in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, conduct, action and inaction of Defendants was negligent, rendering Defendants liable for actual damages, attorneys' fees and costs in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

58. As a result of NBD and SafeRent's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: loss of at least one employment opportunity, loss of sleep, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

59. Plaintiff is entitled to recover actual, statutory, and punitive damages and attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Plaintiff is entitled to recover actual damages and attorneys' fees and costs in an amount determined by the Court pursuant to 15 U.S.C. § 1681o.

### COUNT TWO—VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681k(a)(1) and 1681k(a)(2)

60.     Plaintiff realleges and incorporates all paragraphs above as if fully setout herein.

61.     On one or more occasions, each Defendant failed to send the required § 1681k(a)(1) notice to Plaintiff that it had provided an employment-purposed consumer report to a user that contained public record information of the type that is likely to have an adverse effect on a consumer's ability to obtain or maintain employment.

62.     Similarly, at all times relevant, Defendants did not ever follow strict procedures designed to ensure that they only furnish complete and up-to-date public records. In fact, Defendants uniformly failed to sell or furnish the complete public record and instead only obtained and provided very limited data available through a batch and/or automated pickup.

63.     Plaintiff was unaware of these violations until the information was provided to him in the notice in connection with class action proceedings in the U.S. District Court for the Eastern District of Virginia.

64.     Defendants' failure to timely provide the required FCRA notice(s) to Plaintiff violated 15 U.S.C. § 1681k(a)(1).

65.     Defendants' failure to follow strict procedures designed to ensure that they did not furnish incomplete or out-of-date public records regarding Plaintiff violated 15 U.S.C. § 1681k(a)(2).

66.     The conduct, action and inaction of Defendants was willful, rendering Defendants liable for actual, statutory, and punitive damages, attorneys' fees and costs in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, conduct, action and inaction of Defendants was negligent, rendering Defendants liable for actual damages, attorneys' fees and costs in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

67.     As a result of Defendants' conduct, Plaintiff suffered particularized and concrete injuries, including being robbed of his congressionally-mandated right to information to which Congress has deemed him entitled.  Access to this information is important because (1) it is highly personal in nature; (2) it is maintained and reported by third parties to whom Plaintiff had no pre-existing relationship; (3) it is ultimately sold to third parties to whom Plaintiff is applying for employment without Plaintiff having the opportunity to view it in advance; and (4) it is potential determinative information in extremely important interactions—applications for employment or credit.

68.     Having been denied this important information, Plaintiff was harmed because he did not know what information was circulated about him and by whom and was subsequently denied an opportunity to correct inaccurate or obsolete information. As a result, Plaintiff was at an increased risk to be denied employment.

69.     Plaintiff is entitled to recover actual, statutory, and punitive damages and attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n or 1681o.

## COUNT THREE—FRAUD
### Virginia Common Law

70.     Plaintiff realleges and incorporates paragraphs 1-53 above as if fully setout herein.

71.     This fraud claim is an alternative claim to the Court finding that Defendants' prior position about the 15 U.S.C. § 1681p time periods was accurately stated to the Court and that Defendants received a benefit from that position such that it is now judicially (or otherwise) estopped from asserting a contrary position.

72.     Defendants had a common-law duty not to conceal their position on the availability of individual relief for Plaintiff (and all *Henderson* and *Witt* settlement class members) during the process for securing preliminary and final approval of the *Henderson* and *Witt* class settlements.

73.     Defendants had a common-law duty not to misrepresent their position on the availability of individual relief for Plaintiff (and all *Henderson* and *Witt* settlement class members) during the process for securing preliminary and final approval of the *Henderson* and *Witt* class settlements.

74.     Defendants intentionally and affirmatively concealed and misrepresented their position on the availability of individual relief for Plaintiff (and all *Henderson* and *Witt* settlement class members) during the process for securing preliminary and final approval of the *Henderson* and *Witt* class settlements.

75.     But for Defendants' intentional and affirmative concealment and misrepresentations regarding their position on the availability of individual relief for Plaintiff (and all *Henderson* and *Witt* settlement class members) during the process for preliminary and final approval of the *Henderson* and *Witt* class settlements, the Court would not have approved the *Henderson* and *Witt* class settlements.

76.     But for Defendants' intentional and affirmative concealment and misrepresentations regarding their position on the availability of individual relief for Plaintiff (and all *Henderson* and *Witt* settlement class members) during the process for preliminary and final approval of the *Henderson* class settlement, settlement class counsel would not have continued forward to seek preliminary and final approval of the *Henderson* and *Witt* class settlements.

77.     The concealment and misrepresentations detailed in this Amended Complaint constituted a false representation of material fact because they were designed to assure the Court

and counsel for the *Henderson* and *Witt* settlement class that settlement class members, including Plaintiff, retained their rights to pursue individual claims against Defendants, notwithstanding the settlement and final dismissal of *Henderson* and *Witt*.

78.     Defendants' concealment and misrepresentation of its true position that the FCRA permanently barred the individual claims of many thousands of *Witt* settlement class members, including Plaintiff, constituted a material fact because it was critical to the Court's understanding and approval of the *Witt* and *Henderson* class settlements, as detailed in the numerous statements by counsel and the Court included in this Amended Complaint.

79.     Defendants intentionally and knowingly concealed their position because Defendants repeatedly, over the course of months, falsely represented their position to the Court and settlement class counsel and, in the face of numerous statements by the Court that it understood the settlements to preserve individual claims by settlement class members like Plaintiff, never once attempted to advise the Court that they took the position that approval of the *Henderson* class settlement would permanently bar the individual claims of all 75,400 class members and approval of the *Witt* class settlements would permanently bar many thousands of class members' individual claims. Even as the Court denied and overruled multiple objections because the Court deemed the rights of settlement class members to be preserved by the *Henderson* and *Witt* settlement and settlement class counsel confirmed to the Court that these objectors retained individual claims, Defendants stood silent and voiced no objection to the statements of the Court or settlement class counsel.

80.     When Plaintiff's counsel pointed out the inconsistencies between Defendants' position that all *Henderson* settlement class members and many thousands of *Witt* settlement class members forfeited their claims by operation of 15 U.S.C. § 1681p and Defendants' conduct and

representations during the *Henderson* and *Witt* class settlements approval process and negotiations, Defendants' counsel refused to even advise whether it asserted that 15 U.S.C. § 1681p barred Plaintiff's claims. Despite the plain meaning and import of its conduct and representations during the *Henderson* and *Witt* class settlements approval process and negotiations, Defendants deny that any misrepresentations or concealment occurred.

81.     Defendants engaged in affirmative concealment of its position that all *Henderson* settlement class members and many thousands of *Witt* settlement class members forfeited their claims by operation of 15 U.S.C. § 1681p. Defendants intentionally misrepresented their position that all *Henderson* settlement class members and many thousands of *Witt* settlement class members forfeited their claims by operation of 15 U.S.C. § 1681p.

82.     This Court and *Witt* settlement class counsel, acting as fiduciaries to Plaintiff (and all *Henderson* and *Witt* settlement class members), relied on Defendants' affirmative concealment and misrepresentations. Because of the Court's reliance on Defendants' affirmative concealment and misrepresentations, the Court preliminarily and finally approved the *Henderson* and *Witt* class settlements. Because of *Henderson* and *Witt* settlement class counsel's reliance on Defendants' affirmative concealment and misrepresentations, *Henderson* and *Witt* settlement class counsel sought preliminary and final approval of the class settlement.

83.     Because Defendants directed their affirmative concealment and misrepresentation at the Court and settlement class counsel, acting as fiduciaries for Plaintiff (and all other *Henderson* and *Witt* settlement class members), Defendants committed actual fraud as to Plaintiff.

84.     Because of Defendants' intentional concealment and falsehoods, done with intent to mislead the Court and settlement class counsel, which succeeded in misleading the Court and settlement class counsel, and because the Court and settlement class counsel reasonably relied on

the intentional concealment and misrepresentations by Defendants, Plaintiff was economically prejudiced because the Court approved the *Witt* class settlements, extinguishing any right for Plaintiff to seek individual relief against Defendants for actual, statutory, and punitive damages, attorneys' fees, and costs.

85.     In perpetrating its fraud against the Court and Plaintiff, Defendants acted intentionally, deliberately, willfully, wrongfully, oppressively, recklessly, and with such disregard of the rights of Plaintiff as to constitute legal malice. Defendants' conduct was manipulative, premeditated, and abusive to the Court and Plaintiff (and all other *Henderson* and *Witt* settlement class members).

86.     As a proximate result of the fraud perpetrated against Plaintiff by Defendants, Plaintiff was harmed and will continue to be harmed because he lost the value of his claim for actual, statutory, and punitive damages, attorney's fees, and costs; he incurred the filing fee paid to the Court in this action; he was greatly inconvenienced; and he wasted time and money to pursue his claims in this action.

87.     As a result of the facts set forth hereinabove, Plaintiff is entitled to entry of a judgment in his favor against Defendants for compensatory damages.

88.     As a result of the facts set forth hereinabove, there are grounds for this Court to enter a judgment in favor of Plaintiff and against Defendants for punitive damages.

89.     As a result of the facts set forth hereinabove, there are grounds for this Court to enter an order requiring Defendants to pay the reasonable attorney's fees of Plaintiff's counsel for preparing, filing, and maintaining this count.

### COUNT FOUR—CONSTRUCTIVE FRAUD
**Virginia Common Law**

90.     Plaintiff realleges and incorporates paragraphs 1-53 and 71-85 above as if fully setout herein.

91.     While Plaintiff maintains that the facts set forth in this Amended Complaint describe actual fraud, in the alternative, Plaintiff alleges that the concealment and misrepresentation by Defendants constituted constructive fraud because such concealment and misrepresentations were false representations and Plaintiff relied upon them to Plaintiff's detriment, as described in Count Three of this complaint.

92.     As a result of the constructive fraud set forth above (also pled in the alternative like the actual fraud claim), Plaintiff was harmed and will continue to be harmed because Plaintiff lost the value of Plaintiff's claim for actual damages, attorney's fees, and costs; Plaintiff incurred the filing fee paid to the Court in this action; Plaintiff was greatly inconvenienced; and Plaintiff wasted time and money to pursue his claims in this action.

93.     As a result of the facts set forth hereinabove, Plaintiff is entitled to entry of a judgment in his favor against Defendants for compensatory damages.

WHEREFORE, Your Plaintiff demands judgment for actual/compensatory, statutory, and punitive damages against the Defendants; for attorneys' fees and costs; for prejudgment and postjudgment interest at the legal rate; and such other relief the Court does deem just, equitable and proper.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.

Respectfully Submitted,

**MICHAEL TAYLOR,**

BY: /s/*Drew D. Sarrett*
Drew D. Sarrett, VSB #81658
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
(804) 905-9900—Telephone
(757)930-3662—Facsimile
Email: drew@clalegal.com

Leonard A. Bennett, VSB #37523
Craig Marchiando, VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660—Telephone
(757) 930-3662—Facsimile
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

*Counsel for the Plaintiff*